1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

FRANCISCO CHIPRES-MADRIZ,

        Defendant.

_____/

No. CR 09-00676 MHP

**MEMORANDUM & ORDER**

**Re:  Defendant Chipres-Madriz's Motion to Dismiss the Indictment**

      Defendant Francisco Chipres-Madriz ("Chipres-Madriz") is charged with one count of violating 8 U.S.C. section 1326(a), illegal reentry after removal.  Chipres-Madriz now moves to dismiss the indictment filed against him by collaterally challenging, pursuant to 8 U.S.C. section 1326(d), the validity of the 1999 removal order and the nine subsequent reinstatements of that removal order that function as the predicates for his prosecution under section 1326(a).  Having considered the arguments of the parties and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

      Chipres-Madriz, a native and citizen of Mexico, entered the United States at San Ysidro, California, in 1996 without inspection.  Docket No. 20 (Lucas Dec.), Exh. B (Transcript of Removal Hearing)[1].  In early-November 1999, Chipres-Madriz was in custody in the San Francisco County jail after having been arrested for sale of a controlled substance.  Docket No. 15 (Falk Dec.), Exh. D

(Record of Deportable Alien). On November 4, 1999, the then Immigration and Naturalization Service ("INS"), which is now called Immigration and Customs Enforcement ("ICE"), issued a detainer for Chipres-Madriz. Falk Dec., Exh. C (Immigration Detainer). Immigration authorities interviewed him on that day, and determined that he was in the United States illegally. *See* Record of Deportable Alien. Although the state criminal charges against Chipres-Madriz were ultimately dismissed, Chipres-Madriz was subsequently transferred into the custody of the INS. *Id.*; Falk Dec., Exh. E (Transfer Form). On November 8, 1999, INS authorities read Chipres-Madriz his rights, issued him a Notice to Appear and set bond at $20,000. *See* Falk Dec., Exh. F (Notification of Rights); Falk Dec., Exh. G (Notice to Appear); Falk Dec., Exh. H (Bond Determination).

On December 6, 1999, after Chipres-Madriz had been transferred to Eloy, Arizona, the INS conducted his removal hearing. The hearing consisted of two segments relevant to the motion. In the first, Immigration Judge John Zastrow ("IJ Zastrow") conducted a group admonition session in which he orally conveyed general information about the format and purpose of the removal proceedings to a group of twelve aliens, including Chipres-Madriz.[2] Notably, IJ Zastrow did not mention, let alone explain, that some of the aliens might be eligible for various forms of relief from removal, including voluntary departure pursuant to 8 U.S.C. section 1229c(a)(1). *See* Transcript of Removal Hearing at 1-4.

Later, IJ Zastrow conducted the second relevant segment of the proceeding, Chipres-Madriz's individual removal hearing. Prompted by questioning from IJ Zastrow, Chipres-Madriz acknowledged that he understood the charges against him, admitted that he was born in and was presently a citizen of Mexico and conceded that he entered the United States without inspection. *Id.* at 4. Chipres-Madriz also conceded that he was removable for his entry into the country. *Id.* at 5. IJ Zastrow then determined that there were no convictions on Chipres-Madriz's criminal record, although Chipres-Madriz had been arrested regarding the since-dropped charges for sale of a controlled substance. *Id.* IJ Zastrow and Chipres-Madriz then engaged in the following critical colloquy:

| | |
|---|---|
| IJ Zastrow | Sir, you don't appear to have a criminal record. Umm, even though I know about an arrest here in the United States, that doesn't count, it counts in Mexico but not here. Uh, do you have $7.50 to pay your way out of the United States? |
| Chipres-Madriz | No. |
| IJ Zastrow | Ok, then I can't let you go voluntarily. I find on the basis of respondent's admission . . . by clear and convincing evidence that the respondent is unable to pay for passage out of the United States. Therefore he becomes able to be deported and the respondent be removed from the United States to Mexico as charged in the notice to appear. Sir, do you wish to appeal my decision, or will you accept my decision? |
| Chipres-Madriz | I want to go to Mexico. |
| IJ Zastrow | Then say "I accept your decision." |
| Chipres- Madriz | I accept it. |
| IJ Zastrow | Ok, the government en acuerdo? |
| Gov't Att'y | Yes Your Honor. |
| IJ Zastrow | Thank you. |

*Id.* at 5-6.

On that same day, IJ Zastrow issued a written order of removal for Chipres-Madriz. Falk Dec., Exh. I (Order of Immigration Judge). The order does not indicate that Chipres-Madriz applied for any relief from deportation, including voluntary departure, or that IJ Zastrow denied such an application. *Id.* Chipres-Madriz was found ineligible for reentry for ten years and was actually deported to Mexico that day. *See* Falk Dec., Exh. J (Warrant of Removal); Falk Dec., Exh. K (Warning to Alien).

Nowhere in the record of Chipres-Madriz's removal is there any evidence that any government official ever advised Chipres-Madriz of his eligibility for voluntary departure, or that Chipres-Madriz waived his right to apply for pre-hearing voluntary departure. Further, Chipres-Madriz, in his declaration in support of his motion, swears that no government official ever explained to him the concept of pre-hearing voluntary departure or that he might be eligible for such relief. *See* Falk Dec., Exh. L (Chipres-Madriz Dec.) ¶¶ 5. Chipres-Madriz states that had he been informed of his potential eligibility for voluntary departure, he would have applied for it. *Id.* ¶ 9.

3

1    Although Chipres-Madriz did not have $7.50 on his person at the time of the removal hearing, he

2    claims that he could have obtained that amount by calling any of a number of acquaintances, *id.*,

3    including his friend, Joe Porcoro, who has declared that he would have immediately wired Chipres-

4    Madriz $10 if he had been asked, Falk Dec., Exh. M (Porcoro Dec.) ¶ 10.

5         On nine occasions between the date of his removal and January 28, 2004, Chipres-Madriz

6    reentered the United States, was apprehended, and subsequently had his removal order reinstated by

7    the INS, pursuant to 8 U.S.C. section 1231(a)(5) and 8 C.F.R. section 241.8; Chipres-Madriz did not

8    object to any of the reinstatements. *See* Falk Dec., Exh. P (collecting nine Notices of

9    Intent/Decision to Reinstate Prior Order, dated August 7, 2002; September 14, 2002; February 26,

10   2003; March 21, 2003; March 29, 2003; April 2, 2003; April 18, 2003; May 8, 2003; and January

11   28, 2004).  Further, according to the government,[3] on January 23, 2003, Chipres-Madriz was

12   convicted of a violation of California Health and Safety Code section 11352, for transportation/sale

13   of a controlled substance.  Chipres-Madriz returned to the United States some time after January 28,

14   2004.  The government claims that he was "arrested and/or convicted on several occasions" since

15   2004, but that it was not until his most recent arrest in February of 2009 that ICE discovered his

16   presence in the country.  According to the government, Chipres-Madriz was not released into ICE's

17   custody until September 2009.  The government filed the one-count indictment against Chipres-

18   Madriz in this action on July 2, 2009.  Docket No. 1.  The indictment alleges Chipres-Madriz's

19   removal order and nine reinstatements of that removal order as predicates for the prosecution of

20   Chipres-Madriz under U.S.C. section 1326(a).  Indictment at 1.

21

22   <u>DISCUSSION</u>

23        Chipres-Madriz contends that the indictment filed against him must be dismissed because

24   neither his original removal order nor the subsequent reinstatements of the removal order can serve

25   as a lawful predicate for his prosecution under 8 U.S.C. section 1326(a).  Specifically, he asserts that

26   (1) his 1999 removal order is invalid because IJ Zastrow prejudicially failed to "advise" or "inform"

27   him of his eligibility for voluntary departure, and (2) that the nine reinstatements of the 1999

28

                                                    4

1   removal order are also invalid because they improperly reinstated the constitutionally infirm 1999

2   removal order.  The court addresses each contention in turn.

3   I.      Constitutionality of the 1999 Removal Order

4           A.      Collateral Challenges to Removal Orders Used in Section 1326(a) Prosecutions

5           To convict an individual under 8 U.S.C. section 1326(a), the government must prove that (1)

6   the defendant is an alien (2) who "has been denied admission, excluded, deported, or removed or has

7   departed the United States while an order of exclusion, deportation, or removal is outstanding,"  and

8   thereafter, (3) "enters, attempts to enter, or is at any time found in, the United States" without the

9   consent of the Attorney General.  Immigration and Nationality Act (INA) § 240, 8 U.S.C. § 1326(a).

10          Generally, federal district courts lack the power to review removal orders.  *See*

11  *Martinez-Rosas v. Gonzales*, 424 F.3d 926, 928-29 (9th Cir. 2005).  Judicial review of a prior

12  removal order is appropriate, however, "in any subsequent proceeding in which the result of the

13  deportation proceeding is used to establish an element of a criminal offense."  *United States v.*

14  *Mendoza-Lopez*, 481 U.S. 828, 839 (1987).  "To succeed in such a collateral attack, the defendant

15  must demonstrate that: (1) he exhausted any administrative remedies available to him to appeal the

16  removal order, (2) the underlying proceedings at which the order was issued improperly deprived

17  him of the opportunity for judicial review, and (3) the entry of the order was fundamentally unfair."

18  *United States v. Lopez-Velasquez*, 568 F.3d 1139, 1142 (9th Cir. 2009) (citing 8 U.S.C. § 1326(d),

19  which has been recognized as codifying the holding in *Mendoza-Lopez*).  A defendant can establish

20  the third prong—fundamental unfairness—by showing that "(1) [his] due process rights were

21  violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result

22  of the defects."  *Id.* at 1142 (quoting *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th

23  Cir. 2004)).

24          B.      Fundamental Unfairness

25          The court begins with the third prong of the collateral challenge standard—fundamental

26  unfairness.

27

28

5

1    1.    <u>Due Process</u>

2        Within the Ninth Circuit, it is well-established that, where the record at a removal hearing

3   raises an inference that an alien is entitled to relief from deportation, an immigration judge's failure

4   to "inform" or "advise" an alien of that eligibility constitutes a denial of the alien's due process

5   rights.  *See United States v. Gonzalez-Valerio*, 342 F.3d 1051, 1054 (9th Cir. 2003) ("The duty of

6   the IJ to inform an alien of his eligibility for relief is mandatory, and the failure to do so constitutes a

7   violation of the alien's due process rights."); *United States v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th

8   Cir. 2001) ("Failure to . . . inform the alien [of eligibility for relief from deportation that is apparent

9   from the record] is a denial of due process that invalidates the underlying deportation proceeding.");

10  *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000) ("[W]here the record contains an

11  inference that the petitioner is eligible for relief from deportation, 'the IJ must advise the alien of this

12  possibility and give him the opportunity to develop the issue.' ") (quoting *Moran-Enriquez v. INS*,

13  884 F.2d 420, 422-23 (9th Cir.1989)).

14       Here, Chipres-Madriz asserts that it was apparent from the record at his removal hearing that

15  he was eligible for relief in the form of pre-hearing or "fast track" voluntary departure, pursuant to 8

16  U.S.C. section 1229c(a)(1).  Section 1229c(a)(1) allows an immigration judge, in his or her

17  discretion, to "permit an alien voluntarily to depart the United States at the alien's own expense . . . ,

18  in lieu of being subject to [formal removal] proceedings . . . or prior to the completion of such

19  proceedings, if the alien is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4)(B)

20  of this title."  8 U.S.C. § 1229c(a)(1).[4]  An immigration judge's failure to "advise" or "inform" an

21  alien of his eligibility for voluntary departure is a violation of the alien's due process rights.  *See*

22  *United States v. Ortiz-Lopez*, 385 F.3d 1202, 1204 (9th Cir. 2004) .

23       The record of Chipres-Madriz's removal hearing plainly contained an inference that Chipres-

24  Madriz was eligible for voluntary departure.  In fact, it is apparent from the transcript that IJ Zastrow

25  recognized Chipres-Madriz's potential eligibility.  After inquiring of the government whether

26  Chipres-Madriz had "any kind of criminal record," IJ Zastrow was informed that the only entry in

27  Chipres-Madriz's criminal history was an arrest for possession/sale of a controlled substance.

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Transcript of Removal Hearing at 5.  IJ Zastrow then asked Chipres-Madriz whether he possessed

2   $7.50 "to pay [his] way out of the United States," as section 1229c(a)(1) requires.  *Id.*  Further, after

3   Chipres-Madriz answered that he did not have $7.50, IJ Zastrow stated that he "can't let [Chipres-

4   Madriz] go voluntarily."  *Id.*

5        The government asserts that by asking Chipres-Madriz whether he had $7.50 "to pay [his]

6   way out of the United States," IJ Zastrow "offered" Chipres-Madriz voluntary departure, and

7   thereby discharged his constitutionally mandated duty.  *See* Docket No. 24 (Gov't Opp'n) at 13.  In

8   support of this proposition, the government cites to *United States v. Martinez-Valdez*, 22 Fed. Appx.

9   507, 508 (9th Cir. 2009), an unpublished opinion from the Ninth Circuit.  In *Martinez-Valdez*, the

10  alien-appellant claimed that "the IJ improperly conditioned [voluntary departure] on ability to pay

11  travel expenses."  *Id.* at *1.  The Ninth Circuit held that the "terms of the voluntary departure statute

12  expressly limit such relief to those able to depart at their own expense," and thus rejected the alien's

13  claim that his removal proceedings failed to comport with due process.  *Id.  Martinez-Valdez* could

14  be read as holding that where an immigration judge asks an alien whether he can pay his way out of

15  the country, and he responds in the negative, the alien is not, in fact eligible for voluntary departure,

16  and no due process violation has occurred.

17       The district court record in *Martinez-Valdez*, however, reveals a critical factual distinction

18  between that case and the instant matter: In *Martinez-Valdez*, the immigration judge explicitly

19  discussed the concept of voluntary departure at length during the group admonition portion of the

20  removal hearing.  The immigration judge delivered the following explanation to all of the aliens

21  during the group admonitions:

22       If you are not eligible to remain in the United States you may be eligible for the relief
         of voluntary departure.  That means you would leave the US voluntarily as opposed
23       to being removed and deported.  The benefits of being granted voluntary departure
         are that you could return to the US legally in the future without certain time
24       restrictions.  If you are ordered removed and deported from the United States, you
         will be barred for a minimum of 10 years from returning legally.

25       If you are eligible for voluntary departure, I will ask you if you have the amount of
26       money to pay your own way back to your own country.  It is alleged the majority are
         natives and citizens of Mexico.  The cost to Mexico from this location by bus as I
27       have been told by government attorneys on past occasions is 7 dollars.  I will [ask]
         each of you if you have that amount of money.

28

*United States v. Martinez-Valdez*, 07-cr-3401-L (S.D. Cal.), Docket No. 15-1 (Transcript of *Martinez-Valdez* Removal Hearing) at 8-9. Because the immigration judge had fully explained the concept of voluntary departure during the group admonition, when he asked Martinez-Lopez, "Do you have the seven dollars for the voluntary departure fee," Martinez-Lopez fully understood the consequences of answering no. Put somewhat differently, because the immigration judge had explained the requirements for eligibility for voluntary departure, he effectively "informed" and "advised" Martinez-Lopez of his own eligibility for relief from deportation.

In contrast, although IJ Zastrow asked a number of questions—about Chipres-Madriz's criminal history and finances—in order to determine whether Chipres-Madriz was eligible for relief from deportation, IJ Zastrow never discussed voluntary departure generally or Chipres-Madriz's eligibility specifically in a manner capable of "advising" or "informing" Chipres-Madriz. Prior to holding that Chipres-Madriz was deportable—that is, during both the group admonition and Chipres-Madriz's individual hearing—IJ Zastrow never uttered either the word "voluntary" or "departure." As a result, when IJ Zastrow asked Chipres-Madriz whether he possessed $7.50 to self-finance his departure from the country, Chipres-Madriz was forced to answer in a vacuum. Without having been "informed" or "advised" of his eligibility for voluntary departure, he, unlike Martinez-Lopez, had no means of understanding the consequences of his answer.[5] The court holds that *Martinez-Lopez* is inapplicable where, as here, an immigration judge fails entirely to provide an alien with any information about the eligibility requirements and consequences of voluntary departure. The information conveyed to Chipres-Madriz during the group and individual portions of his removal hearing, which was devoid of any mention or explanation of voluntary departure, could not possibly have "advised" or "informed" him of his eligibility for voluntary departure. Accordingly, the court holds that the removal proceedings violated Chipres-Madriz's due process rights.

2.    Prejudice

In order to satisfy the prejudice prong of the "fundamental unfairness" analysis, an "alien does not have to show that he actually would have been granted relief. Instead, he must only show

that he had a 'plausible' ground for relief from deportation." *Ubaldo-Figueroa*, 364 F.2d at 1050 (quoting *Arrieta*, 224 F.3d at 1079). Quite clearly, Chipres-Madriz had a "plausible ground" for being granted voluntary departure; because he had never been convicted of an aggravated felony (or any crime for that matter), had not engaged in terrorist activities and was capable of procuring $7.50, he satisfied the requirements of section 1229c(a)(1). "Once [the defendant] makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome." *United States v. Gonzalez-Valerio*, 342 F.3d 1051, 1054 (9th Cir. 2003). The only evidence that the government cites to rebut Chipres-Madriz's prima facie showing is that he had been arrested on drug charges prior to his deportation hearing. Those charges, however, had been dropped by the time Chipres-Madriz appeared before IJ Zastrow. In fact, IJ Zastrow acknowledged that "even though I know about an arrest, here in the United States that doesn't count, it counts in Mexico, but not here." Transcript of Removal Hearing at 5. The record indicates that if Chipres-Madriz stated that he possessed $7.50, IJ Zastrow would have granted him voluntary departure.

In its moving papers and at the hearing on this motion, the government also argued that because voluntary departure is discretionary, Chipres-Madriz could not possibly have been prejudiced by IJ Zastrow's failure to "advise" or "inform" Chipres-Madriz of his eligibility for such relief. The government relies on the unpublished district court opinion in *Martinez-Valdez*, in which Judge Lorenz in the Southern District of California, held that "even if Defendant established statutory eligibility, there is no entitlement to voluntary departure because it is a privilege, not a right, and the decision to grant voluntary departure rests in the discretion of the Attorney General." Docket No. 25 (Frey Dec.), Exh. A (*United States v. Martinez-Valdez*, 07-cr-3401-L (S.D. Cal. May 14, 2008)). Accordingly, Judge Lorenz found that even if the immigration judge inadequately "advised" and "informed" Martinez-Valdez of his eligibility for voluntary departure, Martinez-Valdez would not have been prejudiced by that failure. In relying on the district court opinion in *Martinez-Valdez*, the government misstates the concept of prejudice as it applies to collateral challenges under section 1326(d). To satisfy the prejudice prong of the analysis, the defendant must

9

**United States District Court**
For the Northern District of California

1    show only "a plausible grounds for relief from deportation." *Ubaldo-Figueroa*, 364 F.2d at 1050.  If

2    IJ Zastrow had "advised" or "informed" Chipres-Madriz of his prima facie eligibility for voluntary

3    departure, it is not only "plausible," but probable that Chipres-Madriz would have answered the

4    question about his finances differently.  And had Chipres-Madriz done so, it is not only "plausible,"

5    but probable, the IJ Zastrow would have granted Chipres-Madriz voluntary departure, as IJ Zastrow

6    did to the very next alien for which he conducted the individualized portion of the removal hearing.

7    Simply because IJ Zastrow could have denied Chipres-Madriz voluntary departure does not make it

8    implausible that he would have granted him that relief.

9        Accordingly, the government has not presented evidence to rebut Chipres-Madriz's prima

10   facie showing of prejudice, and the court holds that Chipres-Madriz was, in fact, prejudiced by IJ

11   Zastrow's failure to "inform" or "advise" Chipres-Madriz of his eligibility for voluntary departure.

12        C.    Exhaustion and Denial of Opportunity for Judicial Review

13        Having held that Chipres-Madriz removal hearing was fundamentally unfair, the court now

14   turns to the first two prongs of section 1326(d) analysis—exhaustion and denial of opportunity for

15   judicial review.  Where a defendant establishes that his removal proceedings were fundamentally

16   unfair due to the prejudicial failure of an immigration judge to "inform" or "advise" the alien of

17   eligibility for relief from deportation, even if that defendant waived his appeal of the immigration

18   judge's decision, it is essentially presumed that the alien "exhausted any administrative remedies

19   available to him to appeal the removal order" and was "deprived . . . of the opportunity for judicial

20   review."

21        An alien's waiver of appeal is only valid if it is "considered and intelligent." *Ubaldo-*

22   *Figueroa*, 364 F.3d at 1049.  If "the record contains an inference that the petitioner is eligible for

23   relief from deportation, but the IJ fails to advise an alien of this possibility and give him an

24   opportunity to develop the issue, [the Ninth Circuit does] not consider an alien's waiver of his right

25   to appeal his deportation order to be considered and intelligent." *United States v. Pallares-Galan*,

26   359 F.3d 1088, 1096 (9th Cir. 2004) (quotations marks and citations omitted).  And where an alien's

27   waiver is not "considered and intelligent," he is exempted from satisfying the exhaustion of

28

**United States District Court**
For the Northern District of California

1    administrative remedies requirement.  *See Ortiz-Lopez*, 385 F.3d at 1204 n.2 (holding that where

2    alien is not informed of eligibility for voluntary departure, "he would be 'exempted from the

3    exhaustion requirement . . . because the IJ did not inform him that he was eligible for relief from

4    [removal]' " (quoting *Ubaldo-Figueroa*, 364 F.3d at 1049)).  Similarly, "an alien who is not made

5    aware that he has a right to seek relief necessarily has no meaningful opportunity to appeal the fact

6    that he was not advised of that right," and thus has no opportunity for judicial review.  *Arrieta*, 224

7    F.3d at 1079; *see Ortiz-Lopez*, 385 F.3d 1202, 1204 n.2 (9th Cir. 2004) (holding that alien who was

8    not informed of his eligibility for voluntary departure was denied a meaningful opportunity for

9    judicial review).

10          As discussed above, IJ Zastrow failed to "inform" or "advise" Chipres-Madriz of his

11   eligibility for voluntary departure.  In so doing, IJ Zastrow also deprived Chipres-Madriz of a

12   meaningful opportunity for judicial review and absolved Chipres-Madriz from having to satisfy the

13   administrative exhaustion requirement of section 1326(d).

14          Accordingly, the court holds that, with respect to Chipres-Madriz's 1999 deportation, he has

15   satisfied the three elements for collaterally challenging the removal order.  If the government's

16   prosecution of Chipres-Madriz for illegal reentry after deportation was predicated solely on the 1999

17   removal order, the court would now be required, pursuant to section 1326(d) and *United States v.*

18   *Mendoza-Lopez*, 481 U.S. 828 (1987), to dismiss the indictment filed against Chipres-Madriz.  Such

19   is not the case, however.  The government contends that the nine subsequent reinstatements of

20   Chipres-Madriz's removal order can also function as the legal foundation for the section 1326(a)

21   charge.  The court must thus determine whether reinstatements of a constitutionally infirm removal

22   order can serve as the basis for prosecution under section 1326(a).

23   II.    Reinstatements of Constitutionally Flawed Removal Order as a Predicate for Prosecution
            Under 8 U.S.C. section 1326(a)

24
            Chipres-Madriz and the government have both presented sophisticated arguments regarding

25   whether a reinstatement of a constitutionally flawed removal order can serve as a predicate for

26   prosecution under 8 U.S.C. section 1326(a).  Before delving into the substance of the parties'

27   contentions, the court provides some background about the reinstatement process and its relationship

28

11

to formal removal proceedings. The Attorney General derives the authority to reinstate a prior order

of removal, as opposed to conducting an entirely new removal proceeding, from section 241 of the

INA, 8 U.S.C. § 1231(a)(5). That subsection, entitled "reinstatement of removal orders against

aliens illegally reentering," provides that:

> [i]f the Attorney General finds that an alien has reentered the United States illegally
> after having been removed or having departed voluntarily, under an order of removal,
> the prior order of removal is reinstated from its original date and is not subject to
> being reopened or reviewed, the alien is not eligible and may not apply for any relief
> under this chapter, and the alien shall be removed under the prior order at any time
> after the reentry.

*Id.* Prior to 1997, reinstatement proceedings were conducted by immigration judges and were

applicable only to a small sub-group of previously removed aliens found to have reentered the

United States. In 1997, the reinstatement process was changed dramatically in two separate ways.

First, the Attorney General promulgated a regulation permitting immigration officials, not

immigration judges, to conduct reinstatement proceedings. *See* 8 C.F.R. § 241.8. Pursuant to that

regulation, an immigration official can reinstate a prior order of removal if she confirms three

relevant facts: (1) "[w]hether the alien has been subject to a prior order of removal"; (2) "[t]he

identity of the alien, i.e., whether the alien is in fact an alien who was previously removed, or who

departed voluntarily while under an order of exclusion, deportation, or removal"; and (3) "[w]hether

the alien unlawfully reentered the United States." *Id.* Second, Congress passed the Illegal

Immigration Reform and Immigrant Responsibility Act (IIRIRA), which altered the reinstatement

provision of the INA such that it "applie[d] to all illegal reentrants, explicitly insulate[d] the

[predicate] removal orders from review, and generally foreclose[d] discretionary relief from the

terms of the reinstated order." *Fernandez-Vargas v. Gonzalez*, 548 U.S. 30, 33 (2006). In *Morales-*

*Izquierdo v. Gonzales*, 486 F.3d 484 (9th Cir. 2006), the Ninth Circuit, sitting en banc, explicitly

approved of the new reinstatement procedures, holding that it was within the Attorney General's

power to promulgate 8 C.F.R. section 241.8 and that the new reinstatement procedures did not, on

their face, violate the Due Process Clause. *See id.* at 489-498.

In order to determine whether a reinstatement of a constitutionally flawed removal order can

serve as a predicate for a section 1326(a) prosecution, the court must begin (and to some extent end)

12

United States District Court

For the Northern District of California

1   its analysis with *Mendoza-Lopez*.  In *Mendoza-Lopez*, 481 U.S. 828, the Supreme Court explained

2   that its "cases establish that where a determination made in an administrative proceeding is to play a

3   critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful

4   review of the administrative proceeding."  *Id.* at 837-38.  At the very minimum, "[t]his principle

5   means . . . that where the defects in an administrative proceeding foreclose judicial review of that

6   proceeding, an alternative means of obtaining judicial review must be made available before the

7   administrative order may be used to establish conclusively an element of a criminal offense."  *Id.* at

8   838.  With respect to section 1326, the Supreme Court held that "[d]epriving an alien of the right to

9   have the disposition in a deportation hearing reviewed in a judicial forum requires . . . that review be

10   made available in any subsequent proceeding in which the result of the deportation proceeding is

11   used to establish an element of a criminal offense."  *Id.*; *see also id.* at 839 ("[A] collateral challenge

12   to the use of a deportation proceeding as an element of a criminal offense must be permitted where

13   the deportation proceeding effectively eliminates the right of the alien to obtain judicial review.").

14   The Ninth Circuit has recognized that *Mendoza-Lopez* directly resulted in Congress' adoption of 8

15   U.S.C. section 1326(d), discussed above.  *See United States v. Estrada-Torres*, 179 F.3d 776, 780

16   (9th Cir. 1999) *overruled on other grounds by, United States v. Rivera-Sanchez*, 247 F.3d 905 (9th

17   Cir. 2001).

18           Both in practice and on its face, the reinstatement process pursuant to 8 U.S.C. section

19   1231(a)(5) and 8 C.F.R. section 241.8 does not provide an alien with any means of judicial review.

20   The government, in its moving papers, makes no meaningful attempt (nor could it) to refute this

21   characterization of the law.  "Reinstatement—unlike INA § 240 first-instance removal—'deprives

22   aliens of any relief, reopening, or *review* at the reinstatement stage.' "  *Morales-Izquierdo*, 486 F.3d

23   at 491 (emphasis added) (quoting *De Sandoval v. U.S. Att'y Gen.*, 440 F.3d 1276, 1281 (11th Cir.

24   2006)).  In reinstatement proceedings, aliens cannot apply for any relief from reinstatement of the

25   removal, cannot challenge the validity of the underlying removal order, cannot be represented by

26   counsel and cannot place extrinsic evidence before the immigration officer.  As discussed above, an

27   immigration official considers only three factors when deciding whether to reinstate an alien's prior

28                                                              13

removal order: (1) the identity of the alien, (2) that the alien has previously been deported, and (3) that the alien illegally reentered the United States.  To be certain, 8 C.F.R. section 241.8 does "provide[] significant procedural safeguards against erroneous reinstatements." *Morales-Izquierdo*, 486 F.3d at 495.[6]  "Procedural safeguards," however, are not the equivalent of the "meaningful" judicial review that *Mendoza-Lopez* mandates be available "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction."  481 U.S. at 837-38.

Given the reinstatement proceeding's streamlined nature, a reinstatement is functionally and legally the "result" of the underlying removal proceeding.  And pursuant to *Mendoza-Lopez*, "review [must] be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense." *Id.* at 838.  Consequently, where the government seeks to use a reinstatement as a predicate "removal" for purposes of a section 1326(a) prosecution, an alien must be provided with an opportunity to collaterally challenge the underlying removal order that gave rise to the reinstatement.  Further, the validity of the reinstatement turns on the validity of the underlying removal order.

A number of courts presented with cases similar to Chipres-Madriz's have concluded that a reinstatement founded upon a flawed removal order suffers from the same constitutional defect as the removal order.  In *United States v. Charleswell*, 456 F.3d 347 (3d Cir. 2006), a defendant facing charges under section 1326(a) sought the right to challenge both his removal order and any subsequent reinstatements of that order on the grounds that he was not advised or informed of eligibility for relief from deportation at his removal hearing.  As here, the government asserted that the reinstatements could be collaterally challenged independently, but claimed that the removal order's validity was irrelevant to the reinstatement's validity.  The Third Circuit rejected the government's position, explaining that:

> *Mendoza-Lopez* did not constrict collateral challenges in the way that the government advocates and we do not agree that, for purposes of a collateral challenge, we are limited to reviewing only the 2001 Reinstatement.  Rather, under *Mendoza-Lopez*, an alien may mount, and we must hear, a challenge to the validity of both a reinstatement order and the original deportation or removal order.  To hold otherwise would allow the government to avoid the consequences of a fundamentally unfair

underlying deportation or removal proceeding simply by deleting it from the indictment, in contravention of the teaching in *Mendoza-Lopez* that "where a determination made in an administrative proceeding is to play a *critical role* in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." *Mendoza-Lopez*, 481 U.S. at 837-38 (first emphasis added). Reinstatement orders do not exist independent and separate from their prior orders of removal but are instead explicitly premised on the prior order. *See* 8 U.S.C. § 1231(a)(5); *Ramirez-Molina*, 436 F.3d at 514. Consequently, the prior order remains a critical element of the reinstatement and, more importantly, of the illegal re-entry charge where that charge is premised on the reinstatement. Thus, insofar as the underlying element of the § 1326 proceeding is the reinstatement order, an alien may attempt to collaterally challenge both the original deportation order and the reinstatement order. And, where either proceeding—the reinstatement or the original—is so procedurally flawed that it "effectively eliminated the right of the alien to obtain judicial review," we may invalidate the criminal charges stemming therefrom. *See Mendoza-Lopez*, 481 U.S. at 839.

*Charleswell*, 456 F.3d at 352 (some citations omitted).

Judge Alsup, of this court, reached the same conclusion in a somewhat different context. In *United States v. Lopez-Hernandez*, No. CR 06-00645 WHA, 2007 WL 608111 (N.D. Cal. Feb. 23, 2007), Judge Alsup granted a defendant's motion to dismiss the indictment which collaterally challenged his underlying removal order and subsequent reinstatement. At the defendant's 1997 removal hearing, the immigration judge erroneously informed the defendant that he was not eligible for any form of relief from deportation. After appealing the immigration judge's determination, the defendant was deported in 1999. He returned to the United States in 2000 and was convicted of felony possession of narcotics. In that same year and after serving his state prison term, he was convicted of violating section 1326(a) and sentenced to 30 months in federal prison. After his prison term was complete in 2004, ICE reinstated his 1997 removal order and expelled the defendant from the country. Finally, in 2006, immigration officials located the defendant in the United States and instituted a new section 1326(a) charge against him. The indictment predicated the defendant's violation of section 1326(a) on both his 1997 removal order and his 2004 reinstatement. In his motion to dismiss, the defendant challenged only the validity of the 1997 removal order.

On the above set of facts, Judge Alsup concluded that the validity of the 2004 reinstatement rose or fell on the validity of the 1997 reinstatement. Judge Alsup wrote that "the original deportation order is a keystone of a Section 1326 prosecution. Due process requires consideration of that order if a criminal defendant challenges its validity pursuant to 1326(d)." *Id.* at *7.

15

**United States District Court**
For the Northern District of California

1    Accordingly, Judge Alsup held that "[f]or purposes of establishing a prior deportation, the

2    government may not rely solely on a reinstatement order if the underlying deportation did not

3    comport with due process.  A defendant may challenge the underlying deportation order on due

4    process grounds." *Id.* at *4.  After determining that the defendant had satisfied the three elements of

5    section 1326(d), Judge Alsup dismissed the indictment.  *Id.* at *14.

6            Judge Chesney, also of this court, dismissed a section 1326(a) indictment from the bench

7    under strikingly similar circumstances in *United States v. Arias-Ordonez*, 07-cr-00738-MMC (N.D.

8    Cal.) (Chesney, J.).  In that case, in 2003, an immigration judge issued an order of removal for the

9    defendant in absentia; eventually, the defendant surrendered and was physically removed from the

10   country.  On eight subsequent occasions, he returned to the country, was discovered by immigration

11   authorities, and had his 2003 removal order reinstated.  *Id.*, Docket No. 29 (United States' Second

12   Supplemental Brief Opposing Defendant's Motion to Dismiss) at 2-3.  After the eighth

13   reinstatement, the defendant returned to the United States again, was apprehended by law

14   enforcement authorities and charged under section 1326(a).  In the criminal proceedings, Judge

15   Chesney held that the defendant's underlying 2003 removal order violated his due process rights

16   because he was not advised and informed of his eligibility for voluntary departure.  *Id.*, Docket No.

17   53 (Transcript of Proceedings, May 28, 2008) at 4-5.  As a result of the holding, Judge Chesney

18   dismissed the entire indictment, concluding that the government "cannot take a tainted reinstatement

19   and essentially launder the . . . original deportation.  [I]t bears the same taint as the original

20   deportation." *Id.* at 6.

21           At least two other district courts have also held that reinstatements "bear[] the same taint as

22   the original deportation."  *See United States v. Gomez-Hernandez*, No. CR-08-6005-FVS, 2008 WL

23   209876, at *6 (E.D. Wash. May 1, 2008) ("The Court finds that the reinstatement process is

24   unconstitutional as applied to the present case.  *Mendoza-Lopez* established that a criminal defendant

25   must be permitted to collaterally attack a deportation order underlying the charges pending against

26   him or her if there was no opportunity for judicial review at the time of the original removal.  The

27   reinstatement process does not permit review of the underlying deportation order. . . . Given that the

28

16

United States District Court

For the Northern District of California

1  May 11, 2006 removal order deprived the Defendant of due process of law, it would be a further

2  deprivation of due process to charge the Defendant with criminal conduct on the basis of subsequent

3  reinstatements."); *United States v. Barajas-Hernandez*, No. CR 06-00283-TUC-CKJ (BPV), 2007

4  WL 2670150, at *3 (D. Ariz June 8, 2007) ("If Defendant's 1997 removal was invalid, then all that

5  follows, including any reinstatement of that removal, his federal conviction in 2000, his 'second

6  removal,' and the present prosecution, is an unjust legacy of that removal.").  Further, the Ninth

7  Circuit, albeit in an unpublished opinion, held that:

8      where the government relies on a reinstatement proceeding as the predicate
       deportation or removal for a § 1326 prosecution, the alien maintains the limited right
9      under *Mendoza-Lopez* to show that the original proceeding was "so procedurally
       flawed that it 'effectively eliminate[d] the right of the alien to obtain judicial
10     review,' " and that the due process violation prejudiced him.  [*United States v.*]
       *Alvarado-Delgado*, 98 F.3d at 493 [9th Cir. 1996] (quoting *Mendoza-Lopez*, 481 U.S.
11     at 840).  If the underlying proceeding violated due process as described in
       *Mendoza-Lopez* and the alien was prejudiced by that deficiency, neither the
12     reinstatement proceeding nor the original proceeding, which was reinstated may be
       used as the predicate offense for the § 1326 prosecution.  *See Alvarado-Delgado*, 98
13     F.3d at 493.

14  *United States v. Martinez-Vitela*, 225 F.3d 665, 2000 WL 687698, at *4 (9th Cir. 2000)

15  (unpublished).  Although *Martinez-Vitela* is not binding, its reasoning, which rests heavily upon

16  *Mendoza-Lopez*, is sound.[7]

17      The government relies upon a series of Ninth Circuit opinions that, it suggests, stands for the

18  proposition that a reinstatement of a removal order can serve as the predicate for a section 1326(a)

19  prosecution, even if the removal order that supports the reinstatement failed to comport with due

20  process.  The government begins with *United States v. Luna-Madellaga*, 315 F.3d 1224, 1226 (9th

21  Cir. 2003), in which the Ninth Circuit held that section 1326 "speaks only of 'removal,' " and

22  "plainly turns on the alien's *physical removal*—not the order of removal."  (Emphasis added).  The

23  government asserts that *Luna-Madellaga*, as well as *United States v. Diaz-Luevano*, 494 F.3d 1159,

24  1161-62 (9th Cir. 2007), a more recent case affirming *Luna-Madellaga*'s continued strength,

25  establish that a reinstatement of a *valid* removal order, standing alone, can serve as a predicate for

26  prosecution under section 1326(a).

27

28

17

United States District Court

For the Northern District of California

In order to prevail on the instant motion, however, the government must justify an additional legal and logical leap. Given Chipres-Madriz's successful collateral challenge of his 1999 removal order, the government must convince the court that a reinstatement of a *constitutionally infirm* removal order, standing alone, can function as the basis for a section 1326(a) prosecution. In service of that effort, the government turns to a civil immigration decision, the previously mentioned *Morales-Izquierdo v. Gonzales*. In *Morales-Izquierdo*, the alien claimed that "a removal order may not constitutionally be reinstated if the underlying proceeding itself violated due process." *Morales-Izquierdo*, 486 F.3d at 497. The Ninth Circuit, sitting en banc, held to the contrary:

> Reinstatement of a prior removal order—regardless of the process afforded in the underlying order—does not offend due process because reinstatement of a prior order does not change the alien's rights or remedies. The only effect of the reinstatement order is to cause Morales' removal, thus denying him any benefits from his latest violation of U.S. law, committed when he reentered the United States without the Attorney General's permission in contravention of INA § 212(a)(9), 8 U.S.C. § 1182(a)(9).

*Id.* at 498. The government suggests that *Morales-Izquierdo* provides the legal basis for denying Chipres-Madriz's motion.

In so arguing, the government asks the court to read far, far too much into *Morales-Izquierdo*, a holding that the en banc court explicitly limited to the immigration context. In *Morales-Izquierdo*, the Ninth Circuit explained that a reinstatement "does not change the alien's rights or remedies," precisely because a reinstatement "imposes no civil or criminal penalties, creates no new obstacles to attacking the validity of the removal order, and does not diminish petitioner's access to whatever path for lawful reentry into the United States might otherwise be available to him under the immigration laws." *Id.* The unmistakable subtext of the opinion is that if, as a consequence of a reinstatement, an alien would suffer additional criminal or civil penalties or would face additional barriers to challenging the original removal order, a court must consider the validity of the underlying removal order. Accordingly, *Morales-Izquierdo* is not persuasive, on the facts here and in light of *Mendoza-Lopez*, "where criminal penalties are at stake." *Lopez-Hernandez*, 2007 WL 608111, at * 7; *see id.* ("Permitting the government to rely solely on the reinstatement of an unlawful order *would* create additional criminal penalties and *would* create new obstacles to a

18

United States District Court

For the Northern District of California

1    criminal defendant challenging the original order pursuant to Section 1326(d).  The defendant would

2    be completely foreclosed from challenging the original deportation order regardless of the process

3    afforded by the original order.  The defendant would face criminal penalties as a result.  Such a

4    system would directly contradict the Supreme Court's pronouncement that due process permits a

5    collateral attack of an administrative proceeding where that proceeding plays 'a critical role in the

6    subsequent imposition of a criminal sanction.'  *Mendoza-Lopez*, 481 U.S. at 837-38.").

7           Therefore, the court holds that under *Mendoza-Lopez*, the reinstatement of a constitutionally

8    inform removal order cannot function as the predicate for a section 1326(a) prosecution.  Due

9    process does not permit the government to "launder," *United States v. Arias-Ordonez*, 07-cr-00738-

10   MMC, Transcript of Proceedings, May 28, 2008 at 6, or "avoid the consequences of a fundamentally

11   unfair underlying deportation or removal," *Charleswell*, 456 F.3d at 352, by utilizing a reinstatement

12   of a flawed removal order as the foundation of a section 1326(a) indictment.  This rule is in accord

13   with the Supreme Court's directives as well as common sense.

14          The court has already determined that Chipres-Madriz's 1999 removal order was invalid.

15   The court now holds that because of the flaws in the 1999 removal order, the nine reinstatements of

16   the 1999 removal order are similarly invalid.  Accordingly, none of the nine reinstatements can serve

17   as the predicate for Chipres-Madriz's prosecution under section 1326(a).  Without the removal order

18   or the reinstatements, the indictment filed against Chipres-Madriz cannot stand.  Accordingly,

19   Chipres-Madriz's motion to dismiss the indictment is GRANTED.

20

21   CONCLUSION

22          For the reasons expressed above, defendant Chipres-Madriz's motion to dismiss the

23   indictment is GRANTED.

24

25          IT IS SO ORDERED.

26
     Dated: January 27, 2010                          _____

27                                                     MARILYN HALL PATEL
                                                       United States District Court Judge
28                                                     Northern District of California

                                              19

**United States District Court**

For the Northern District of California

**ENDNOTES**

1. In support of his motion, Chipres-Madriz submitted a transcript of his removal proceeding that was transcribed by Amy Jo Lucas, a legal secretary within the San Francisco office Federal Public Defender. As such, it is not an official transcript of the proceedings. However, the government has not identified any inaccuracies in the transcript, and, after listening to the tape of the proceeding, the court is confident that the transcript presents an accurate depiction of what transpired at the removal hearing.

2. During the group admonition session, IJ Zastrow collectively informed the aliens, including Chipres-Madriz, that they: had a right to retain an attorney; may be eligible for a bond redetermination; had a right to contact their consulate or embassy; had the right to present evidence, including witnesses and documents, on their behalf; had a right to inspect the documents that the government sought to enter into the record, have those documents translated by an interpreter, and object to their admission; had the right to question any witnesses that the government called against them; had the right to appeal, within thirty days, any order issued by IJ Zastrow; alternatively, had the right to accept any order of removal issued by IJ Zastrow without appealing, and be immediately deported to Mexico; would, if ordered removed, be ineligible to return to the United States for a minimum period of five years, and depending on their individual circumstances, may never be able to return; would, if they were ordered removed and subsequently reentered the United States without permission, be committing the crime of illegal reentry after removal, for which they could be imprisoned for up to 20 years and fined up to $250,000. *See* Transcript of Removal Hearing at 1-4.

   IJ Zastrow also collectively asked the aliens, including Chipres-Madriz, whether they: wanted to procure an attorney (all answered no); had received a copy of the Notice to Appear filed against them (all answered yes); wanted to be placed on the bond redetermination calendar (one alien, not Chipres-Madriz, responded yes; the judge denied the request); wanted to contact their consulate or embassy (all answered no); at the conclusion of the group admonition session, understood their "rights and the warning against returning" (all answered yes). *See id.*

3. The government has not included anything in the record to indicate that Chipres-Madriz ever was convicted of such a charge. However, Chipres-Madriz has not objected to the government's characterization of his alien or criminal record after his removal order was issued in 1999.

4. Section 1227(a)(2)(A)(iii) allows the government to deport any alien who has been convicted of an aggravated felony, while section 1227(a)(4)(B) permits the deportation of any alien who has engaged in terrorist activities. The government does not contend that Chipres-Madriz falls into either of those categories.

5. Perhaps unsurprisingly, in his own declaration, Chipres-Madriz explains that he believed that if responded that he did have the funds, "they [the government] were going to charge [him] to be deported . . . ." Docket No. 15 (Chipres-Madriz Dec.) ¶ 4.

6. First, where the alien disputes his identity, "verification of identity shall be accomplished by a comparison of fingerprints," 8 C.F.R. § 241.8(a)(2); where no fingerprints are available, the immigration official cannot reinstate the removal order. *Id.* Second, an alien's removal order cannot be reinstated unless the immigration official obtains "the prior order of exclusion, deportation, or removal relating to the alien," 8 C.F.R. § 241.8(a)(1); if that documentation is not procured, the matter is referred to an immigration judge. Third, in determining whether the alien entered the United States illegally, the immigration officer must "consider all relevant evidence, including statements made by the alien and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of INS date systems available to the officer." 8 C.F.R. § 241.8(a)(3). *See generally Morales-Izquierdo*, 486 F.3d at 495.

20

7.   *Martinez-Vitela* was originally a published opinion, which the Ninth Circuit withdrew and superseded, and then ultimately withdrew in its entirety. *See United States v. Martinez-Vitela*, 183 F.3d 1131 (9th Cir. 1999), *withdrawn and superseded by* 193 F.3d 1047 (9th Cir. 1999), *withdrawn by* 213 F.3d 1205 (9th Cir. 2000).  The above-quoted language, however, appeared in almost identical form in all three iterations of the opinion.

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28